**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **RACHEL DENNERT,**               )<br>                                                          )<br>         **Plaintiff**                           )<br>                                                          )<br>         **vs.**                                    )<br>                                                          )<br> **MEDTRONIC, INC; MEDTRONIC**  )<br> **DIABETES, a Division of**              )<br> **MEDTRONIC, INC.;**                       )<br> **UNOMEDICAL DEVICES SA de CV** )<br> **and UNOMEDICAL A/S**                 )<br>                                                          )<br>         **Defendants**                       )<br>                                                          )<br>_____) | **Civil No. 3:11-cv-01229-SRU**.<br><br><br><br><br>**SECOND AMENDED**<br>**COMPLAINT & JURY DEMAND** |

Plaintiff RACHEL DENNERT, by way of Amended Complaint against defendants says:

**JURISDICTION**

1. Jurisdiction is based upon diversity of citizenship and jurisdictional amount pursuant to 28 U.S.C. §§ 1332 and 1333.

2. Plaintiff RACHEL DENNERT is a resident of the State of Connecticut and was so at all times material hereto.

3. Defendant MEDTRONIC, INC is a resident of the State of Minnesota.

4. Defendant MEDTRONIC DIABETES, a Division of MEDTRONIC, INC. is a resident of the State of California.

5. Defendant UNOMEDICAL DEVICES SA de CV, is a Mexican company with its principal place of business in Reynosa, Mexico.

6. Defendant UNOMEDICAL A/S, is the parent company of UNOMEDICAL DEVICES SA de CV with a principal place of business in the Kingdom of Denmark.

7. The matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars ($75,000.00).

## VENUE

8. Venue is properly laid in the United States District Court for the District of Connecticut pursuant to 28 U.S.C. § 1391(e) as the plaintiff resides within the District of Connecticut and all of the defendants conduct business in and within the State of Connecticut.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

## THE PARTIES

9. At all times material hereto, plaintiff was a resident of the State of Connecticut.

10. At all times material hereto defendant MEDTRONIC, INC. was and is a corporation or other business entity with its principal place of business in the City of Minneapolis, State of Minnesota and is the parent corporation of defendant MEDTRONIC DIABETES, a wholly-owned subsidiary of MEDTRONIC, INC. and was involved in the discovery and/or design and/or assembly and/or manufacture and/or testing and/or packaging and/or labelling and/or marketing and/or distribution and/or sale and/or was otherwise involved in placing in the stream of commerce the medical devices called The MiniMed Paradigm® Insulin Pump and Medtronic Silhouette® Infusion Sets.

11. At all times material hereto, defendant MEDTRONIC DIABETES was and is a corporation or other business entity and a wholly owned subsidiary of defendant MEDTRONIC, INC. with its principal place of business in Northridge, California and was involved in the discovery and/or design and/or assembly and/or manufacture and/or testing and/or packaging

and/or labelling and/or marketing and/or distribution and/or sale and/or was otherwise involved in placing in the stream of commerce the medical devices called The MiniMed Paradigm® Insulin Pump and Medtronic Silhouette® Infusion Sets.

12. At all times material hereto defendant UNOMEDICAL DEVICES SA de CV was a corporation or other business entity with its principal place of business in Reynosa, Mexico and was and is a wholly owned subsidiary of UNOMEDICAL A/S and was involved in the discovery and/or design and/or assembly and/or manufacture and/or testing and/or packaging and/or labelling and/or marketing and/or distribution and/or sale and/or was otherwise involved in placing in the stream of commerce the medical device called Medtronic Silhouette® Infusion Sets.

13. At all times material hereto defendant UNOMEDICAL A/S was and is a corporation or other business entity with its principal place of business in the Kingdome of Denmark and was and is the parent corporation of UNOMEDICAL DEVICES SA de CV, a wholly owned subsidiary of UNOMEDICAL A/S and was involved in the discovery and/or design and/or assembly and/or manufacture and/or testing and/or packaging and/or labeling and/or marketing and/or distribution and/or sale and/or was otherwise involved in placing in the stream of commerce the medical device called Medtronic Silhouette® Infusion Sets.

**GENERAL ALLEGATIONS**

14. This action arises from the product liability of defendants for their defective medical devices which plaintiff, Rachel Dennert, utilized and thereby suffered serious and permanent personal injuries. Plaintiff is an adult person and a natural born citizen of the United States and resident of Trumbull, Connecticut.

15. Plaintiff Rachel Dennert suffered a nearly fatal injury from a malfunction of an insulin pump and/or subcutaneous insulin infusion set designed, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, placed in the stream of commerce, and sold or otherwise provided to plaintiff by Defendants, MEDTRONIC, INC. and/or MEDTRONIC DIABETES, a Division of MEDTRONIC, INC and/or UNOMEDICAL DEVICES SA de CV and/or UNOMEDICAL A/S.

16. Plaintiffs' injuries proximately resulted from the negligent, and/or reckless and/or other wrongful acts and/or omissions, and fraudulent misrepresentations of Defendants and/or each of them, all of which occurred within the venue of this court.

17. At all times relevant to this action, the term "Defendants" includes all Defendants unless otherwise noted, including but not limited to MEDTRONIC, INC. and/or MEDTRONIC DIABETES and/or UNOMEDICAL DEVICES SA de CV and UNOMEDICAL A/S.

18. At all times herein mentioned, the Defendants, and each of them, were authorized to do business within the state of Connecticut and did in fact supply, distribute, formulate, prescribe and/or sell or otherwise place into the stream of commerce the aforementioned products within the state of Connecticut.

**FACTUAL ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION**

A. RACHEL DENNERT

19. In early August 2009, plaintiff Rachel Dennert, suffered an acute anoxic brain injury secondary to severe hypoglycemia caused by the apparent malfunction of the insulin pump and an infusion sets she had been utilizing.

20. At the time of her injuries, Rachel was a 19 year old woman preparing to enter Northeastern University in Boston, Massachusetts to study pharmacy. She was first diagnosed with diabetes at the age of 16 which initially was thought to be Type II non-insulin dependent

but was instead discovered to be Type I insulin dependent when after a couple of years on a strict diabetic diet with oral medication, her glucose control was not well maintained. As a Type I diabetic, she does not produce any insulin naturally and is fully dependent upon exogenous sources of insulin to control her blood glucose level. She was initially begun on a regimen of Lantus combined with Novalog as coverage for meals. After approximately a year on this regimen, her endocrinologist recommended an insulin pump for better control and convenience.

21. In July, 2009, Rachel received Medtronic's Paradigm Real-Time Insulin Pump and Continuous Glucose Monitoring System, Model No. MMT-522NAL together with four boxes of Silhouette infusion sets, numbers MMT-381 (quantity: 2) and MMT-382 (quantity: 2) as well as four boxes of Paradigm reservoirs Ref: MMT-326A, Lot No. H7480331. This equipment was shipped directly to her from Medtronic Diabetes in Northridge, California.

22. On or about July 22, 2009, Rachel and her mother Nancy met with a certified diabetic educator who provided training on the use of the insulin pump in a three hour session. Rachel was then instructed to complete the "pump school" on the Medtronic website, which she did. Rachel and her mother again met with the diabetic educator on July 29, 2009 at the office of Rachel's endocrinologist and were again instructed in the use and maintenance of the pump in a two hour training session before she is started on the pump at a continuous infusion rate of 0.6 units per hour.

23. Rachel changed the infusion sets every three days, as instructed–on August 2, 5 and 8th. The infusion set change on August 8 occurred at approximately 6:45 pm and she refilled the reservoir with 100 units of insulin as instructed. Approximately three hours later, however, the pump alarmed a "low reservoir" condition indicating that 20 units or less remain in the reservoir. According to Medtronic's Insulin Pump User Guide which accompanied the pump supplied to Rachel, the pump limits single bolus doses to 25 units and limits the continuous infusion rate to 2

units per hour. Both of these limits are described as safety features designed to limit the amount of insulin delivered either by way of single dose or continuous infusion. Upon inspection, the reservoir appeared to be nearly empty despite an established infusion rate of 0.6 units *per hour* and only two manual bolus doses totaling 3.2 units delivered in the interim. Rachel believed that there may have been excess spillage of the insulin while priming the tubing on the infusion set replacement but she and her mother waited an hour to see if she exhibited any changes. At 10:18, Rachel checked her glucose which was 260. At 11:00 pm, seeing no unusual effects, Rachel refilled the reservoir with 100 units and went to bed.

24. She was then found at 6:15 am the next morning on the floor in respiratory arrest. Emergency medical services were called and she was transported to Shore Memorial Hospital in Somers Point, New Jersey where they were vacationing. En route, the paramedics were unable to obtain a glucose level—meaning it was zero--and a 50% dextrose push was given. Upon arrival at the hospital, her glucose was noted to be 38 following the dextrose infusion. She was noted to be unresponsive but with decerebrate and decorticate posturing to painful stimuli. Assessment was hypoglycemic coma with anoxic brain injury. She was intubated, stabilized and transferred to Children's Hospital of Philadelphia (CHOP) where she remained until August 19. While at CHOP she underwent placement of an intracranial bolt for pressure monitoring. MRI with and without contrast performed on August 11, 2009 showed "[a]reas of hypoxic ischemic injury along both hippocampi and watershed territory of both cerebral hemispheric cortex suggesting systemic hypotension etiology involved."

25. On May 24, 2011, the pump and insulin sets were subjected to testing at Medtronic Diabetes in Northridge California according to a protocol designed by Medtronic and agreed to by the parties. Part of that testing involved downloading the pump history which was still intact and revealed the following facts:

  a. On August 8, 2009 at 6:46 pm, a pump rewind event—a step in refilling the insulin reservoir of the pump--is recorded;

  b. The previous pump rewind event was recorded almost exactly 3 days earlier at 4:49 pm on August 5, 2009;

  c. The average total daily insulin dose from August 3 through August 7 was 18.25 units meaning that a reservoir refill sufficient to last three days would need to be at least 55 units;

  d. Approximately three hours after the reservoir refill at 6:46 pm, a "low reservoir" alarm is noted at 9:55 pm indicating that only 20 units remain in the pump;

  e. From the reservoir refill at 6:46 pm until the low reservoir alarm at 9:55 pm, two bolus doses—one at 7:06 pm and another at 7:07 pm totaling 3.2 units--are recorded. During this period of time, the pump is also infusing at 0.6 units per hours accounting for approximately 1.8 units. Between the bolus doses and the infusion, 5 units are thus accounted for before the low reservoir alarm at 9:55 pm;

  f. Approximately one hour later, at 10:50 pm, another rewind is recorded indicating a reservoir refill.

  g. Following the refill at 10:50 pm, no further bolus doses are noted, however, even after the pump was disconnected from Rachel around the time she was found unconscious on the morning of August 9, it apparently continued to operate and pump out the insulin placed in the reservoir late on August 8 until approximately 5:35 am on August 16. It recorded pumping 24 hour doses of insulin of 11.60 units on August 9 and doses of 14.4 units every other day from that point until an alarm called "excessive pump counts" is noted at 5:35 am on the morning of the 16th. Taken together with the approximately 0.6 standard infusion she would

have received between approximately 11 pm and midnight of August 8, the reservoir would have been refilled with approximately 100 units.

26.     Because Rachel does not produce insulin on her own, the only possible source of insulin sufficient to induce severe hypoglycemia was the pump she was utilizing which clearly malfunctioned and delivered a massive—and nearly fatal--dose of insulin.

B.     THE PUMP

27.     The pump at issue in this case is a Medtronic Paradigm Real-Time Insulin Pump and Continuous Glucose Monitoring System, Model No. MMT-522NAL, Serial No. PAR672484H, Lot ID. H7493916, Batch No. A6522NALJ manufactured at Medtronic's facility in Juncos, Puerto Rico in or around July 2009 and designed for "the continuous delivery of insulin, at set and variable rates, for the management of diabetes mellitus in persons requiring insulin. According to Medtronic's Insulin Pump User Guide, "[i]nsulin pumps deliver insulin closer to the way the human pancreas delivers insulin than any other method of treating diabetes." The pump utilizes disposable reservoirs for storage of the insulin as well as disposable infusion sets which are catheters designed for delivery of the insulin from the pump reservoir into the human body. Plaintiff was provided with four boxes of Silhouette infusion sets, numbers MMT-381 (quantity: 2) and MMT-382 (quantity: 2) as well as four boxes of Paradigm reservoirs Ref: MMT-326A, Lot No. H7480331.

28.     On June 1, 2009, at around the time the pump in this case appears to have been manufactured and/or packaged and/or labeled, the FDA issued a "Warning Letter" to Medtronic concerning its manufacturing facility in Juncos, Puerto Rico, detailing multiple violations of "Current Good Manufacturing Practice (CGMP) requirements of the Quality System (QS) regulation found at Title 21, Code of Federal Regulations (C.F.R.), Part 820" found on inspections conducted in late 2008. Exhibit 1. Based upon those violations (some but apparently

not all of which are set out in the Warning Letter), the FDA determined that Medtronic's Synchromed II pumps were "adulterated" within the meaning of §351(h) of the federal Food, Drug and Cosmetics Act, 21 U.S.C. § 301, *et. seq.* "in that the methods used in, or the facilities or controls used for, their manufacturer, packing, storing, or installation are not in conformity with the Current Good Manufacturing Practice (CGMP) requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (C.F.R.), Part 820." The FDA also noted that "because your firm uses one manufacturing process for both the Synchromed II Pumps and the MiniMed Paradigm Insulin Pumps," these violations of CGMP applied equally to the MiniMed pump.

29. Specifically, the FDA cited Medtronic for:

    a.    Failure to establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications, which shall include monitoring and control of process parameters and component and device characteristics during production;

    b.    Failure to establish and maintain procedures for implementing corrective and preventive actions that include identifying the action(s) needed to correct and prevent recurrence of non-conforming product and other quality problems as required by 21 CFR 820.100(a);

    c.    Failure to establish and maintain procedures that ensure that Device History Records (DHR's) for each batch, lot or unit are maintained to demonstrate that the device is manufactured in accordance with the Device Master Record (DMR), as required by 21 CFR 820-184;

    d.    Failure to review, evaluate, and investigate complaints involving the possible failure of a device, labeling, or packaging to meet any of its specifications, as required by 21 CFR 820.198(c);

    e.    Failure to report to FDA no later than 30 calendar days after the day that you receive or otherwise become aware of information, from any source, that reasonably suggests that a device you market:  (1) may have caused or contributed to a death or serious injury; or (2) has malfunctioned and this device or a

>
> similar device that you market would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur, as required by 21 CFR 803.50(a); and
>
> f.    Failure to have a person who is qualified to make a medical judgment reasonably conclude that a device did not cause or contribute to a death of serious injury, or that a malfunction would not be likely to cause or contribute to a death or serious injury if it were to recur, as required by 21 CFR 803(c)(2). Persons qualified to make a medical judgment include physicians, nurses, risk managers, and biomechanical engineers  under 21 CFR 803.20(c)(2) . . . Our investigators determined that a product reporting specialist was making decisions about MDR reportability for the MiniMed Paradigm Insulin Pumps. The training record for this particular employee showed that this person only had a high school diploma with some additional in-house training.

30.    Significantly, the FDA determined that the MiniMed Paradigm Insulin Pump was "misbranded" by virtue of the cited violation involving the "fail[ure] or refus[al] to furnish material or information" required under the statute and regulations relating to information that the devices may have either caused or contributed to death or serious bodily injury, or malfunctioned in such a way that if it were to recur would be likely to cause or contribute to a death or serious injury. The FDA then pointed to two examples where Medtronic improperly classified complaints as non-reportable when the company had knowledge of either an acknowledged malfunction of the pump but incorrectly claimed that the malfunction (which led to a patient developing diabetic ketoacidosis) was not likely to lead to death or serious injury if it recurred or deemed another instance of ketoacidosis as non-reportable even though the company had had several reports of this problem associated with the pump demonstrating that if problems were to recur they could lead to death or serious bodily injury (in that case, hospitalization).

31.    Additionally, while the FDA observed generally that the adequacy of Medtronic's responses could not be determined at that time and that "the adequacy of your corrective and preventative measures will be determined during the next inspection," it specifically noted that

Medtronic's response to the violation related to the "[f]ailure to establish and maintain procedures for implementing corrective and preventive action [CAPA] that include identifying the action(s) needed to correct and prevent recurrence of non-conforming product and other quality problems" provided that "a comprehensive review of the CAPA procedures at [the Puerto Rico facility] will be conducted by **July 31, 2009**."

32.     In late June, 2009, a little more than a month before the pump malfunction in this case, Medtronic issued a recall of Paradigm Quick-Set infusion sets manufactured over an 18 month period between December 1, 2007 and June 18, 2009 because of a defect which might "not allow the insulin pump to vent air pressure properly . . . [which] could potentially result in the device delivering too much or too little insulin and may cause serious injury or death." Exhibit 2.  While the infusion sets subject to the recall are different from those at issue in this case, Medtronic was clearly aware of at least one mechanism by which the pump could malfunction (failure to properly vent) which could lead to the delivery of an excessive dose of insulin as happened in this case.

33.     As of the time of the manufacture and distribution of the pump in this case, the FDA had not made a determination as to the adequacy of Medtronic's corrective and preventative actions taken in response to the cited violations of Current Good Manufacturing Process (CGMP)  and indeed, one of the corrective measures—dealing with procedures for implementing corrective and preventive action needed to correct and prevent recurrence of non-conforming product and other quality problems was not even scheduled to be completed until *after* the pump in this case was manufactured and distributed.

34.     At the times and places aforesaid, and at all times material hereto, defendant was under a duty to conform to and manufacture its products in accordance with federal law and in particular with the provisions of the FDCA, and particularly with Current Good Manufacturing

Case 3:11-cv-01229-SRU   Document 54   Filed 05/15/12   Page 12 of 20

Practice (CGMP) requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (C.F.R.), Part 820, *et seq.* which "govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use," and which are "intended to ensure that finished devices will be safe and effective and otherwise in compliance with the Federal Food, Drug, and Cosmetic Act." 21 C.F.R. 820.1.

35. At the times and places aforesaid and at all times material hereto, defendant was in violation of the CGMP requirements and had been cited by the FDA for manufacturing "adulterated" and "misbranded" products as a result of its non-compliance and non-conformance with CGMP.

36. At the time the pump in this case was manufactured and/or packaged and/or labeled and/or distributed, defendant was not in compliance with CGMP requirements and the pump and associated equipment did not comply with the FDCA and applicable regulations and were therefore not in conformance with federal law governing the manufacture and performance of the insulin pumps.

37. The failure to conform to CGMP (or other applicable regulations) means that defendant was unable to verify, in accordance with FDA regulations, that the pump and/or related equipment was (were) safe and effective, fully conformed to specifications and was (were) free of defects that could lead to malfunctions having the potential to cause or contribute to serious bodily injury or death.

38. Additionally, at the times and places aforesaid and at all times material hereto, the pump at issue malfunctioned, delivering, without warning, an unexpected, un-programmed, unwarranted and excessive dose of insulin and therefore did not perform in accordance with or conform to the specifications which formed the basis of the FDA's approval to market the

device.

# FIRST COUNT

CONNECTICUT PRODUCT LIABILITY ACT
Ct. Gen. Stat. § 52-572m *et seq.*
(STRICT LIABILITY)

39. Plaintiff repeats and realleges each and every paragraph of this Complaint as if fully set forth herein.

40. The defendants, and each of them, are medical device companies engaged in the design and/or research and/or manufacture and/or production and/or testing and/or assembling and/or labeling and/or packaging and/or distribution and/or sale and/or otherwise involved in placing into the stream of commerce various medical devices, as hereinbefore set forth, intended for human use including facilitating the infusion and/or consumption and ingestion of drug products such as insulin for the control of diabetes.

41. At the times and places aforesaid and at all times material hereto, defendants, and each of them, held themselves out as knowledgeable and possessing the requisite skill peculiar to the research and/or manufacture and/or production and/or testing and/or assembling and/or labeling and/or packaging and/or distribution and/or sale of such product(s).

42. At the times and places aforesaid, and at all times material hereto, defendants were under a duty to conform to and manufacture their products in accordance with federal law and in particular with the provisions of the FDCA, and particularly with Current Good Manufacturing Practice (CGMP) requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (C.F.R.), Part 820, *et seq.* which "govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use," and which are "intended to ensure that finished devices will be safe and effective and otherwise in compliance

**SECOND AMENDED COMPLAINT FOR DAMAGES**

with the Federal Food, Drug, and Cosmetic Act." 21 C.F.R. 820.1.

43. At the times and places aforesaid and at all times material hereto, defendants were in violation of the CGMP requirements and defendant Medtronic specifically had been cited by the FDA for manufacturing "adulterated" and "misbranded" products as a result of its non-compliance and non-conformance with CGMP.

44. At the time the pump and its associated equipment in this case was manufactured and/or packaged and/or labeled and/or distributed, defendants were not in compliance with CGMP requirements and the pump and associated equipment did not comply with the FDCA and applicable regulations and were therefore not in conformance with federal law governing the manufacture and performance of the insulin pumps.

45. The failure to conform to CGMP (or other applicable regulations) means that defendants were unable to verify, in accordance with FDA regulations, that the pump and/or related equipment was (were) safe and effective, fully conformed to specifications and was (were) free of defects that could lead to malfunctions having the potential to cause or contribute to serious bodily injury or death.

46. Additionally, at the times and places aforesaid and at all times material hereto, the pump at issue malfunctioned, delivering, without warning, an unexpected, un-programmed, unwarranted and excessive dose of insulin and therefore did not perform in accordance with or conform to the specifications which formed the basis of the FDA's approval to market the device.

47. At the times and places aforesaid, and at all times material hereto, defendants, and each of them, placed into the stream of commerce medical devices which failed to perform in accordance with or conform to the specifications approved by the FDA and/or failed to function as intended and/or malfunctioned and were therefore not safe and effective, were unfit for their

intended and foreseeable uses and were in a defective and dangerous condition.

48. Defendants, and each of them, caused or otherwise allowed, enabled or facilitated the placement of dangerous products in a defective condition into the stream of commerce, as hereinbefore set forth, and are strictly liable in tort pursuant to the Connecticut Product Liability Act, Con. Gen. Stat. § 52-572m, *et seq* or other applicable law.

49. As a foreseeable, direct and proximate result of the placement into the stream of commerce by defendants, and each of them, of dangerous products in a defective condition, Rachel Dennert suffered nearly fatal injuries which have left her with permanent and significant disabilities and otherwise sustained damages compensable under the laws of this State.

WHEREFORE, plaintiff demands judgment against defendants individually, jointly, severally and in the alternative for damages, plus interest, attorney's fees, costs of suit and such other relief the court deems equitable and just.

## SECOND COUNT

CONNECTICUT PRODUCT LIABILITY ACT
Ct. Gen. Stat. § 52-572m *et seq.*
(NEGLIGENCE)

50. Plaintiff repeats and realleges each and every paragraph of this Complaint as if fully set forth herein.

51. At all times material hereto, defendants had a duty to assure that those products that they placed or caused to be placed into the stream of commerce were free of defects and reasonably fit and suitable for their intended or foreseeable uses and conformed to federal regulations and performed in accordance with specifications approved by the FDA.

52. At the times and places aforesaid, and at all times material hereto, defendants were under a duty to conform to and manufacture their products in accordance with federal law

and in particular with the provisions of the FDCA, and particularly with Current Good Manufacturing Practice (CGMP) requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (C.F.R.), Part 820, *et seq*. which "govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use," and which are "intended to ensure that finished devices will be safe and effective and otherwise in compliance with the Federal Food, Drug, and Cosmetic Act."  21 C.F.R. 820.1.

53. At the times and places aforesaid and at all times material hereto, defendants were in violation of the CGMP requirements and defendant Medtronic specifically had been cited by the FDA for manufacturing "adulterated" and "misbranded" products as a result of its non-compliance and non-conformance with CGMP.

54. At the time the pump and its associated equipment in this case was manufactured and/or packaged and/or labeled and/or distributed, defendants were not in compliance with CGMP requirements and the pump and associated equipment did not comply with the FDCA and applicable regulations and were therefore not in conformance with federal law governing the manufacture and performance of the insulin pumps.

55. The failure to conform to CGMP (or other applicable regulations) means that defendants were unable to verify, in accordance with FDA regulations, that the pump and/or related equipment was (were) safe and effective, fully conformed to specifications and was (were) free of defects that could lead to malfunctions having the potential to cause or contribute to serious bodily injury or death.

56. Additionally, at the times and places aforesaid and at all times material hereto, the pump at issue malfunctioned, delivering, without warning, an unexpected, un-programmed, unwarranted and excessive dose of insulin and therefore did not perform in accordance with or

conform to the specifications which formed the basis of the FDA's approval to market the device.

57. At all times material hereto, defendants and each of them, placed, or caused to be placed into the stream of commerce, a product or products which malfunctioned and/or failed to operate as intended or expected and which were therefore not safe and effective, were defective and/or not reasonably fit or suitable for their intended or foreseeable uses

58. Defendants and each of them knew, or should have known in the exercise of reasonable care, that their product or products could malfunction and cause injury but negligently placed these non-conforming and defective products into the stream of commerce where they would be expected to be utilized by diabetics like plaintiff Rachel Dennert.

59. As a foreseeable, direct and proximate result of defendants' negligence as hereinbefore set forth, plaintiff Rachel Dennert was exposed to a substantial risk of harm from a defective product in a dangerous condition and did in fact suffer harm as a result of using such a defective product in a dangerous condition and thereby sustained damages compensable under the laws of this State.

WHEREFORE, plaintiff demands judgment against defendants individually, jointly, severally and in the alternative for damages plus interest, attorney's fees, costs of suit and such other relief the court deems equitable and just.

### THIRD COUNT

CONNECTICUT PRODUCT LIABILITY ACT
Ct. Gen. Stat. § 52-572m *et seq.*
(BREACH OF EXPRESS WARRANTY)

60. Plaintiff repeats and realleges each and every paragraph of this Complaint as if fully set forth herein.

61. At all times relevant hereto, defendants, and each of them, expressly warranted by way of written literature, including, but not limited to product labeling, patient package inserts, articles in medical journals, advertising or other documents and/or promotional materials directed to plaintiff's physicians and/or plaintiff, by and through statements made by defendants, and each of them, or their authorized agents or sales representative, orally and/or in publications package insert, or other written materials intended for physicians and/or their patients, that their products were safe, effective, fit and proper for their intended use or foreseeable uses and conformed to FDA regulations and specifications.

62. Apart from any other representations alleged above, Medtronic specifically states in the Insulin Pump User Guide it supplied to plaintiff with the Paradigm MiniMed pump and associated equipment that:

> For your protection the pump has undergone extensive testing to confirm appropriated operation when used with Paradigm reservoirs and Paradigm compatible infusion sets manufactured or distributed by Medtronic Diabetes.

Additionally, the User's Guide represents that the "pump has a sophisticated network of safety checks and systems."

63. Plaintiff Rachel Dennert was prescribed and/or purchased and/or consumed and/or otherwise utilized the defendants' devices for the purposes of controlling her blood glucose levels by way of an insulin pump with its associated equipment. In so doing, plaintiff relied upon the skill, judgment, representation and the foregoing express written warranties of the defendants and each of them. Said warranties and representations were false, misleading and inaccurate in that the aforementioned products were not in compliance with FDA regulations and/or did not conform to or perform in accordance with approved specifications and malfunctioned during use and were not therefore safe and effective and were unfit for the uses

for which they were intended or put with the knowledge and/or encouragement and/or approval of defendants and each of them.

64. As a result of the breach of express warranties by the defendants, and each of them, as hereinbefore set forth, plaintiff, after purchasing and/or consuming and/or ingesting and/or otherwise utilizing defendants' subject non-conforming and defective medical devices, suffered injuries and sustained damages compensable under the laws of this State as set forth herein.

WHEREFORE, plaintiff demands judgment against defendants individually, jointly, severally and in the alternative for damages plus interest, attorney's fees, costs of suit and such other relief the court deems equitable and just.

## FOURTH COUNT

CONNECTICUT PRODUCT LIABILITY ACT
Ct. Gen. Stat. § 52-572m *et seq.*
(BREACH OF IMPLIED WARRANTY)

65. Plaintiff repeats and realleges each and every paragraph of this Complaint as if fully set forth herein:

66. Prior to the time that the aforementioned products were used by plaintiff Rachel Dennert, defendants, and each of them, impliedly warranted to plaintiff and/or plaintiff's physicians that said products were of merchantable quality, were manufactured and/or packaged and/or labeled in accordance with FDA regulations, complied with applicable FDA regulations and approved specifications and were safe, effective and fit for the use for which they were intended or for other known or foreseeable uses.

67. Plaintiff was and is unskilled in the research, design, and manufacture of the aforementioned products and reasonably relied entirely on the skill, judgment and implied

warranties of the defendants, and each of them, in being prescribed, purchasing, consuming and otherwise utilizing the aforementioned products.

68. The aforementioned products were not manufactured and/or packaged and/or labeled in accordance with FDA regulations, did not conform to or perform in accordance with approved specifications and were therefore not safe nor effective for their intended, known or foreseeable uses nor of merchantable quality, as warranted by defendants, and each of them, in that they had the potential to malfunction and cause serious and permanent injuries, including death, when put to their intended, known or foreseeable uses.

69. As a result of the aforementioned breach of their implied warranties by the defendants, and each of them, plaintiff, after being prescribed and/or after purchasing and/or consuming and/or otherwise utilizing defendant's non-conforming, defective products, suffered injuries and sustained damages compensable under the laws of this State as alleged herein.

WHEREFORE, plaintiff demands judgment against defendants individually, jointly, severally and in the alternative for damages plus interest, attorney's fees, costs of suit and such other relief the court deems equitable and just.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury as to all claims herein.

BY: */s/ Kevin Haverty*
KEVIN HAVERTY, *pro hac vice*
Federal Bar No. phv05048
WILLIAMS CUKER BEREZOFSKY, LLC
210 Lake Drive East, Suite 101
Cherry Hill, NJ  08002
(856) 667-0500 (Tel)
(856) 667-5133 (Fax)
Khaverty@wcblegal.com

DATED:     May 15, 2012

**SECOND AMENDED COMPLAINT FOR DAMAGES**